THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SONIA ANAYA, Defendant-Appellant.

First District (4th Division)   No. 1—94—4072

Opinion filed May 9, 1996.

Daniel E. Radakovich, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Julie Line Bailey, and Mary Morris, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a stipulated bench trial, the court found the defendant, Sonia Anaya, guilty of possession of more than 500 grams of cannabis and sentenced her to 30 months' probation and 100 hours of community service. On appeal, the defendant argues that her conviction should be reversed because the trial court erred in denying her motion to suppress evidence. She does not dispute the substance of the testimony given or the credibility of the State's witness. Rather, she maintains that, as a matter of law, the detention of her luggage for a canine narcotics sniff test was not supported by a reasonable suspicion based on articulable and objective facts that the luggage contained contraband. See *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). We agree. We reverse the denial of the motion to suppress and remand for a new trial.

Chicago police officer Kenneth Krok testified at the motion to suppress hearing. He stated that on January 6, 1993, he and several other officers were monitoring the arrival and departure of trains at the Amtrak station in Chicago as part of a narcotics investigation in connection with the United States Drug Enforcement Administration Task Force. He testified that he carefully watched the passengers detraining from the Texas Eagle because it originates in a state that is known for importing illegal narcotics.

The defendant was among the passengers arriving on the Texas Eagle that day. She walked through the train station accompanied by Juan Garza-Diaz. Both were pulling identical, dark blue Samsonite hard-sided suitcases. Diaz also carried a black-and-gray nylon duffle bag. Krok stated that, in his experience, narcotics often are carried in hard-sided luggage.

Krok further testified that he observed the defendant walking through the station for about three to five minutes. He did not observe any outwardly illegal behavior. However, he thought that she looked very flush and walked much more slowly than the other passengers. Krok also described the defendant as having a blank look, as if all of the color had disappeared from her face. He stated that she looked around, appearing nervous and confused.

Officer Krok then observed Diaz place the suitcases and the duffle bag next to one another against a wall and walk to the information desk. The defendant remained with the luggage.

Krok and his partner, Officer Rodriguez, approached Diaz as he walked away from the information desk. Krok displayed his badge and photo identification and asked permission to speak with him. Diaz consented and indicated that he had been on the Texas Eagle. Krok then requested Diaz's train tickets. Diaz had two tickets, which had been purchased with $410 in cash. One of the tickets belonged to the defendant, but both were in the name of "Garze." The tickets were booked for travel from Houston to Chicago with a final stop in Toledo, Ohio. Diaz stated that he was traveling with his woman, referring to the defendant. Diaz also stated that he met Anaya in Texas and had not learned her surname.

Diaz's state of Illinois identification listed his name as Juan Diaz, and his immigration card listed the name of Juan Garza-Diaz. Krok acknowledged that it is common for individuals of Hispanic heritage to receive the surnames of both parents. Diaz's state of Illinois identification card also listed his address as 5032 South Ashland in Chicago. Diaz explained that he had moved to Houston, Texas, and he gave Krok his new address in Houston.

Krok informed Diaz that he was not under arrest and was free to leave, but that he had a few more questions to ask. Krok explained that he was conducting a narcotics investigation and asked permission to search Diaz's bags. Diaz told Krok that he only had a black-and-gray duffle bag. The officers and Diaz then walked over to the area where the defendant had been standing. As they all approached the defendant, Krok pulled out his badge and identified himself as a police officer. Krok described the defendant as having a "flush," blank look on her face and stated that her knees began shaking. Krok again asked permission to search the duffle bag. Diaz again consented. No narcotics were found.

After the search, Krok asked the defendant if she had come in on the Texas Eagle. The defendant did not respond. Krok repeated the question and the defendant softly answered "yes." Krok then requested her identification. The defendant asked why. Krok explained that he was conducting a routine narcotics investigation. He also told the defendant that she was not under arrest and was free to leave. At that point, the defendant's hands shook as she searched through her purse looking for her identification. The defendant gave Krok her Ohio driver's license bearing her photo.

Next, a muddled exchange took place concerning the possession of the suitcases. First Krok pointed to the suitcases and asked, "[A]re

those your bags?" The defendant responded affirmatively in a voice so soft that Krok was uncertain of her response. After Krok repeated the question, the defendant said no. Krok then pointed to the suitcase which was sitting furthest away from the defendant and asked if it was hers. She said yes. Then he pointed to the other bag and asked if it was hers. She said no. Krok again asked whether both bags were hers and she said yes. Krok testified that he asked the defendant if she packed her bags herself, and she said no.

After advising the defendant that she was not under arrest, Krok asked permission to search her luggage but she refused. He then told the defendant that her bags would be temporarily detained so that they could be examined by a trained narcotics dog. Krok explained that the defendant could obtain a receipt for her bag if she accompanied him to his office. The defendant carried the luggage to the office and took the receipt. The officers told her to return in a half hour or 45 minutes to retrieve her bags, which coincided with time that the defendant's train to Ohio was scheduled to depart.

While in the office, the defendant and Diaz were photographed from the waist up in front of a tape measure. Krok testified that the defendant declined to sign the receipt for her luggage. He stated that the photo was intended to enable the police to identify the person whose luggage is detained.

After the defendant left the office, a narcotics dog sniffed the suitcases signaling that they contained drugs. The officers then obtained a search warrant, opened the suitcases and recovered 3,064.5 grams of cannabis wrapped in 11 separate plastic bags.

At the end of the hearing, the trial court concluded that a seizure occurred. The court noted that Krok did not testify that the defendant fit any sort of drug courier profile. However, the court also stated that Krok's observations of the defendant's behavior, such as shaking upon seeing Krok's badge and handing him her identification, were enough to raise some suspicion. The court denied the defendant's motion to suppress.

During the bench trial, the parties stipulated to Officer Krok's testimony, as well as Craig Washington's testimony, concerning the chain of custody of the recovered contraband. The defendant appeals, asking us to reverse the trial court's ruling on the motion to suppress. She also asks that we reverse her conviction or, in the alternative, remand for a new trial.

■ Generally, we will disturb a trial court's ruling on a motion to suppress only if it is manifestly erroneous. However, in the present case we adhere to a *de novo* standard of review because the facts presented to the trial court and the credibility of the State's witness are

undisputed. See *In re D.G.*, 144 Ill. 2d 404, 581 N.E.2d 648 (1991) (whether probable cause exists is a question of law where facts and credibility are not disputed); *People v. Foskey*, 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197 (1990); *People v. Coats*, 269 Ill. App. 3d 1008, 647 N.E.2d 1088 (1995). When a determination concerning an individual's constitutional rights depends on a legal conclusion which is based on "undisputed facts," then a reviewing court must draw its own conclusions. *People v. Clark*, 144 Ill. App. 3d 7, 11, 494 N.E.2d 166, 168 (1986); but see *People v. Stoddard*, 256 Ill. App. 3d 989, 628 N.E.2d 234 (1993). As such, we proceed with the understanding that we review the correctness of the trial court's decision as a matter of law.

■ First, we must determine whether the initial exchange between the defendant and the officers was consensual. The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A seizure takes place when a law enforcement officer either physically restrains a person's freedom to leave the officer's presence or shows authority such that a reasonable person would believe that he or she was not free to leave. *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). No fourth amendment violation occurs when an officer merely seeks permission to ask an individual a few questions and to provide identification. *California v. Hodari D.*, 499 U.S. 621, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991).

■ We find that the initial exchange between the defendant and the police officer was consensual. The encounter occurred in a public place and the officers did not touch the defendant in any manner. Upon approaching the defendant, Officer Krok identified himself and displayed his badge. Although Krok immediately asked the defendant a question concerning the Texas Eagle and requested her identification, he eventually told her that she was not under arrest and promptly returned her driver's license after examining it. Based on the record before us, we find that a reasonable person would have believed that she was free to leave.

The State concedes, however, that the consensual nature of the officers' encounter with the defendant ended when the defendant denied Officer Krok permission to search her luggage. Therefore, in order for the detention of the defendant's luggage to pass constitutional muster, the officers must have had a reasonable and articulable suspicion that she committed or was about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

■ In deciding whether a reasonable suspicion existed, we must consider the " 'totality of the circumstances—the whole picture' " of

each case. *United States v. Sokolow*, 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989), quoting *United States v. Cortez*, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695 (1981). We recognize that a reasonable suspicion may emerge from seemingly innocent, noncriminal conduct. *Sokolow*, 490 U.S. at 10, 104 L. Ed. 2d at 11-12, 109 S. Ct. at 1587. The question for the court is the degree of suspicion which attaches to the circumstances surrounding a defendant's actions. *Sokolow*, 490 U.S. at 10, 104 L. Ed. 2d at 12, 109 S. Ct. at 1587. The facts used to support an investigatory detention are insufficient when they describe "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754 (1980).

Here, the State argues that the following factors gave rise to a reasonable and articulable suspicion that the defendant's luggage contained contraband: (1) her journey originated in Houston, Texas, a city known as a source for illegal narcotics; (2) the defendant was carrying a hard-sided suitcase, commonly used in carrying narcotics; (3) the defendant appeared nervous and shook when Krok spoke to her; (4) the tickets were paid for in $410 in cash; (5) Diaz indicated that he was traveling with his woman, but did not know her surname; and (6) the defendant wavered in responding to Krok's questions about the two suitcases.

Both parties have relied on cases in which courts have found either the presence or absence of a reasonable and articulable suspicion. These cases differ factually from one another and from this case in varying degrees. See *People v. Stoddard*, 256 Ill. App. 3d 989, 628 N.E.2d 234 (1993). None of the cases cited are entirely factually analogous to the case at bar. Therefore, we independently examine the totality of the facts presented to the trial court, in light of this court's prior opinions.

Cases which have examined the issue of whether a reasonable and articulable suspicion exists in a given case may be divided into two general categories. *People v. Steels*, 277 Ill. App. 3d 123, 660 N.E.2d 24 (1995). The first category consists of cases in which courts do not uphold seizures of luggage based on the observed mannerisms of the defendant, accompanied by truthful answers or other behavior, that could be characterized as the actions of an innocent traveler in an unfamiliar environment. *People v. Bailey*, 273 Ill. App. 3d 431, 652 N.E.2d 1084 (1995); *People v. Breeding*, 219 Ill. App. 3d 590, 579 N.E.2d 1128 (1991); *People v. Boyd*, 215 Ill. App. 3d 894, 576 N.E.2d 116 (1991).

In the second category of cases, courts uphold the brief detention

of luggage if the defendant gives incorrect, conflicting, unsatisfactory or untruthful answers to an officer's questions. *People v. Olivarez*, 279 Ill. App. 3d 90 (1996) (defendant lied about traveling with another individual); *People v. Stoddard*, 256 Ill. App. 3d 989, 628 N.E.2d 234 (1993) (defendant had a cavalier attitude concerning his lost wallet containing his identification and gave inconsistent answers to questions); *People v. Furlong*, 217 Ill. App. 3d 1047, 578 N.E.2d 77 (1991) (defendant told officers he came for a brief visit to see a ball game, but was unable to say which team); *People v. Statham*, 209 Ill. App. 3d 352, 568 N.E.2d 183 (1991) (the name on the defendant's luggage, ticket and the one told to police were all different). We further note that other cases emphasize the presence of information about the defendant's actions which is obtained by the police prior to confronting the defendant. See, *e.g.*, *People v. Smithers*, 83 Ill. 2d 430, 415 N.E.2d 327 (1980); *People v. Lynch*, 241 Ill. App. 3d 986, 609 N.E.2d 889 (1993); *People v. Menendez*, 199 Ill. App. 3d 612, 557 N.E.2d 462 (1990); *People v. Jones*, 190 Ill. App. 3d 416, 545 N.E.2d 1332 (1989).

We find the facts of this case most analogous to *Breeding* and *Boyd*. In *Breeding*, the court reversed the denial of a motion to suppress evidence, finding that the police did not have a reasonable and articulable suspicion that the defendant possessed narcotics. The court noted that the police relied on the following factors in detaining the defendant's luggage: the defendant arrived from a source city, she was the last one off the train, she walked slowly, she looked colorless, she looked around a lot and made eye contact with a waiting companion, she told the companion that these were the longest two days of her life and he placed his index finger to his lips, she told the police that she lost her train ticket and she hesitated when the police asked her name.

In reversing, the court noted that two facts which occurred after the initial stop were the defendant's failure to produce her ticket and her answer that her name was "Brown." The court determined that her behavior easily could be characterized as innocent. Her inability to produce a ticket at the end of a trip was inconsequential. Additionally, she did not lie to the officers about her name because she stated that Brown was her married name and Breeding her former name. Finally, the court found the case factually analogous to *Boyd*.

In *Boyd*, the court reversed the defendant's conviction, concluding that the trial court erred in denying his motion to suppress evidence. The police in *Boyd* reviewed a passenger manifest prior to the defendant's arrival and learned that he paid $446.50 in cash for a one-way ticket from Flagstaff, Arizona, to New York via Chicago. The police also relied on the following factors as creating a reasonable

suspicion that the defendant was carrying narcotics: the defendant traveled in a sleeper car on the train, a police officer on the train observed that the defendant never left his luggage alone, he was the last passenger off the train, he looked over his shoulder and made eye contact with the officers, he walked at a hurried pace, appeared nervous, remained in the men's room for several minutes and hesitated when the police requested his train ticket.

The court in *Boyd* determined that the defendant did not lie to the police. The court stated that his answers to questions were not necessarily inconsistent and, therefore, they did not create an articulable suspicion. The court commented that very little imagination was required to realize that there are many plausible explanations for the defendant's behavior.

■ The factors which the State deems are justification for the detention of the luggage do not even rise to the degree of suspicion that was present in *Boyd* and *Breeding*. In the case at bar, we must view the defendant's mannerisms and reaction to Officer Krok's questioning by considering the whole picture of her travels and arrival in Chicago. The defendant's statements cannot be characterized as untruthful. Her wavering responses regarding the possession of the suitcases were not entirely clear, but they were not necessarily inconsistent.

When Krok began questioning the defendant, he referred to both suitcases. At first, Krok thought the defendant said "yes" in response to his question, but he testified that he could not hear her very well. Arguably, some confusion may have resulted from the officer's inability to hear the defendant's response to his question. Also, when the defendant left the train, Diaz was carrying one suitcase and she was carrying the other. Diaz then left her with all three bags and returned accompanied by two police officers. A reasonable conclusion under the facts of this case is that the defendant misunderstood the nature of Krok's inquiry about the luggage.

We further note that Krok received consistent information about the defendant's travels. Also, although Diaz did not know the defendant's surname, he explained that they recently had met in Texas. There is nothing suspect about Diaz's statements about his relationship with the defendant.

Moreover, nothing in the record shows that the defendant gave false information to the officers. Nothing in the record shows that the defendant behaved in a manner which would distinguish her from the general category of travelers passing through the train station. We find that the police officers did not have a reasonable and articulable suspicion that the defendant was carrying contraband.

Therefore, the trial court erred, as a matter of law, in denying the defendant's motion to suppress.

Based on the totality of the circumstances concerning the defendant's arrival in Chicago and her encounter with the police, we find the facts presented insufficient to support a reasonable suspicion that the defendant was carrying narcotics. As we discussed in *Breeding*, we share the concern over the dangers and evils of drug trafficking expressed by the Supreme Court of the United States, as well as the Illinois Supreme Court. *Breeding*, 219 Ill. App. 3d at 601, 579 N.E.2d at 1136. However, we do not approve of a seizure which solely depends on a police officer's subjective interpretation of an individual's mannerisms and other innocent behavior. *Breeding*, 219 Ill. App. 3d at 601, 579 N.E.2d at 1136. A person's mannerisms and wavering responses to questions are certainly proper factors to consider. However, the nature and number of factors in the present case were not sufficient to give rise to a reasonable and articulable suspicion.

We reverse the trial court's order denying the defendant's motion to suppress and remand for a new trial.

Reversed and remanded for a new trial.

HOFFMAN, P.J., and O'BRIEN, J., concur.